IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | | |
|---|---|---|
| GAY SCHAFFER and <br> DAVID SCHAFFER, <br> individually and on behalf of all <br> others similarly situated, <br> *Plaintiffs*, <br> <br> v. <br> <br> COLLINS ASSET GROUP, LLC, <br> FERRUM CAPITAL L.L.C., <br> FERRUM II, LLC, <br> FERRUM III, LLC, <br> FERRUM IV, LLC <br> TEXAS FINANCIAL ADVISORY LLC, <br> BROOKLYN CHANDLER WILLY, <br> MIKE COX, <br> JOSHUA L. ALLEN <br> <br> *Defendants*, | § § § § § § § § § § § § § § § § § § § | **Cause No.5: 23-cv-01204:** <br><br> **Complaint--Class Action** |

**Class Action Complaint**

Plaintiffs Gay Schaffer and David Schaffer file this class action complaint individually and on behalf of all others similarly situated against Defendants Collins Asset Group, LLC ("Collins Asset Group"), Ferrum Capital LLC ("Ferrum"), Plaintiffs allege the following:

**I.   Case Summary**

1.1   This proceeding arises from a fraudulent "investment" plan run by the defendants to this suit who fraudulently induced the Plaintiffs and other class members into investing in their program by offering misleading projections that culminated in the loss of their hard earned retirement savings.

1.2   Plaintiffs Gay Schaffer and David Schaffer are one of the many victims of this scheme, they invested a combined  seven hundred thousand dollars ($715,736.57) in September, and

November of 2019 with the promise that in four years their investments would be returned with forty percent interest (40%).

1.3     The investment program created by the Defendants works as follows: (1) Ferrum Capital acquires funds from lenders with the promise of large returns and safe investments, (2) Ferrum Capital then proceeds to deliver these funds to Collins Asset Group who purchases distressed accounts receivable from both customer and commercial accounts at a large discount, due in large part to the unlikely chance of recovery, (3) Collins Asset Group then delivers a promissory note to Ferrum Capital, and the lender that is "secured" with the very same distressed accounts receivable that the purchased with the lenders funds, and which are difficult, and sometimes, impossible to recover on. Leading to catastrophic losses incurred by the lenders, including Plaintiffs.

1.4     Defendant's fraudulent scheme, as laid out above, turns on an axis centered around the trading of unregistered securities, in the form of promissory notes issued to Plaintiffs and the other class members. The defendants at the time they were operating this scheme were not licensed to trade in securities nor otherwise act as a broker dealer under either federal or state law. The "affiliated" agents and companies of Ferrum who gathered lenders to invest in their program received a commission based on their part in the issuance of the unregistered securities that were issued as promissory notes. They like the other Defendants, were also not registered as a broker dealer, nor licensed to trade in securities.

1.5     To induce Plaintiffs and other class members to invest into their scheme Ferrum produced commercial loan illustrations that seemingly guaranteed a ten-percent (10%) annual return on investment over the course of four years (4 years), which in summation would yield a remarkable forty-percent return (40%) at a fixed rate.

1.6     In addition to the remarkable return on investment being offered, the Defendants further induced Plaintiffs and other class members by relying on the experience of Collins Asset Groups founder Walt Collins, and the seemingly rich and unfailable history of the accounts receivable marketplace or the "ARM" industry.

1.7     Defendants wrote all of their lending information with verbiage intended to shield them from any litigation that would arise from their lenders turned victims inevitable financial losses. Any warning of the risk and speculation of their program was offered to the lender after the presentation of a voluminous presentation of the benefits and security the plan purported to offer, coupled with the constant reassurance to the lenders that the investment was not a risky endeavor. Furthermore, the any warning verbiage was once again copied directly from Sonnoqui LLC, and other shell companies.

1.8     Over the lifetime of this deceptive practice Collins Asset Group, Ferrum Capital, and their affiliated companies and agents raised millions of dollars from unsuspecting lenders when they were aware that there was little to no chance of satisfying the projections they created and continuously offered to all prospective lenders.

1.9     The scheme that Defendants are running is identical to the program ran by Collins Asset Group which was filed in federal court in February of 2020, in the northern district of Georgia styled THAXTON v. COLLINS ASSET GROUP, LLC, COLLINS & HILTON ASSET GROUP, LLC, DIVERSIFIED FINANCING, LLC, MARK W. MILLER, ALT MONEY INVESTMENTS, LLC, ALT MONEY INVESTMENTS II, LLC, ALT MONEY INVESTMENTS III, LLC, ALT MONEY INVESTMENTS IV, LLC, and SONOQUI, LLC. In fact Ferrum uses the exact same glossy marketing verbiage and projections as Sonoqui LLC, a defendant named in the previous scheme. The only change is there are now new "shell companies" involved that are actively shuffling the money of those unfortunate enough to fall for their elaborate ruse.

1.10    Plaintiffs and Class Members seek damages as a result of Defendants' fraudulent scheme that induced Plaintiffs and Class Members to invest in their program when they would have otherwise invested in more traditional sources.  Plaintiffs and Class Members also seek injunctive relief from this Court to prevent Defendants from assigning, transferring or otherwise disposing of any of the collateral or any derived by Defendant Collins Asset Group, LLC through its collection efforts on the collateral.

1.11    As alleged in greater detail below, Defendants are liable to Plaintiffs and Class Members for breach of good faith and fair dealing, fraudulent misrepresentation and concealment, conspiracy to commit fraud, aiding and abetting fraud, breach of fiduciary duty, conspiracy to commit a breach of fiduciary duty, aiding and abetting breach of fiduciary duty, constructive fraud, injunctive relief.

## II.  Jurisdiction, Venue, and Parties

2.1     This court has subject matter jurisdiction over this action under Rule 23 of the Federal Rules of Civil Procedure.  Or alternatively under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), if the class is found to meet those requirements.

2.2     Plaintiff Gay Shaffer is a citizen and resident of the state of Texas.

2.3     Plaintiff David Shaffer is a citizen and resident of the state of Texas.

2.4     Defendant Collins Asset Group, LLC ("Collins Asset Group") is a limited liability company organized and existing under the laws of the State of Delaware, is registered to do

business in Texas. Collins Asset Group may be served at either their registered business location at 5725 W Highway 290 Ste 103, Austin, TX 78735-8722. The registered agent of the business is Urs Agents, Inc. located at 3610-2 North Josey Lane, Suite 223, Carrollton, TX, 75007.

2.5    Defendant Ferrum Capital, LLC is a limited liability company that is registered to do business in Texas. Ferrum Capital LLC may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas.

2.6    Defendant Brooklyn Willy is a citizen and resident of the state of Texas, and does business within the state of Texas. Brooklyn Willy is an affiliate of Ferrum Capital LLC. Brooklyn Willy may be served in San Antonio, Bexar County, Texas at 20650 Stone Oak Parkway, Suite 100, San Antonio, Texas 78258, or wherever she may be found.

2.7    Defendant Mike Cox is a citizen and resident of the state of Texas, and is a director and/or officer of Ferrum Capital LLC. Mike Cox may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas, or wherever he may be found.

2.8    Defendant Joshua L. Allen is a citizen and resident of the state of Texas, and is a director and/or officer of Ferrum Capital LLC. Joshua L. Allen may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas, or wherever he may be found.

2.9    Defendant Ferrum II, LLC, is a limited liability company that is registered to do business in Texas. Ferrum II, LLC may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas.

2.10   Defendant Ferrum III, LLC, is a limited liability company that is registered to do business in Texas. Ferrum II, LLC may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas.

2.11   Defendant Ferrum IV, LLC, is a limited liability company that is registered to do business in Texas. Ferrum IV, LLC may be served at their registered address at 4415 66TH ST STE 101 Lubbock 79414-4811 Texas.

2.12   Defendant Texas Financial Advisory LLC, is a limited liability company that is registered to do business in Texas. Texas Financial Advisory may be served at their registered address at 20650 Stone Oak Pkwy Suite 100, San Antonio, TX 78258.

### III. Facts

**A. Defendants Induced Lenders to Join Their Cause by Reinforcing the History and Experience of Collins Asset Group, and The Accounts Receivable Marketplace or "ARM " industry.**

3.1     Defendant Collins Asset Group, and the all of the companies and agents who participated in their promissory note program induced lenders to join their cause by distributing marketing materials that limited the apparent risk of loss by establishing themselves as experts in a well established industry. These marketing materials gave the following background to the Collins Asset Group, and was distributed by Ferrum Capital:

"Collins Asset Group…was founded by Walt Collins in 2011 and is engaged in the consumer and the commercial distressed debt collection industry. Walt Collins was present at the creation of the modern, technology driven collection industry and of DBA International, Inc ("DBA"), the industry's trade association, which originated in the mid 1990's. Mr. Collins was a founding member of the DBA, it's second president and the Board of Trustees. As such, he has been instrumental in the evolution of the industry in which the the DBA's code of ethics fosters honesty and integrity among industry participants…"

"The Collins management team has over ninety years industry leadership experience and Collins leverages this experience and the science of analytics to access and liquidate portfolios and accounts."

3.2     The Defendants also induced lenders by discussing the rich and storied history of the Accounts Receivable Marketplace, or "ARM" industry in the very same marketing instrument:

"The ARM industry, in which debt collection agencies operate, has been an active part of the U.S. business economy since the birth of the consumer loan, dating back to the late 1700's early 1800's."

"While the economic benefits to consumers are important, the debt buying industry returns real money to creditors' bottom lines."

"Charged off consumer debt is a tangible asset with real economic value that provides a clear benefit to the creditors who sell it."

"[T]he distressed commercial receivables market is growing as companies with uncollected commercial receivables search for solutions to create much-needed liquidity. Constrained traditional capital markets have forced companies to seek alternate methods of creating liquidity and distressed commercial debt buyers have generated a viable solution by purchasing business to business delinquent receivables."

3.3     This verbiage has been copied directly and nearly exactly from the shell companies that acted as intermediaries in *Thaxton,* the tricky language moved from Sonoqui LLC to Ferrum Capital seamlessly to keep the scheme running.

**B. Over the Lifetime of their Scheme Defendants and Their Agents Sold Unregistered Securities in the Form of Promissory Notes.**

3.4     Ferrum Capital was founded in 2017, its managers are Joshua Allen and Mike Cox. Ferrum Capital, Joshua Allen, and Mike Cox are not, and were not at the time they exchanged these promissory notes registered to trade in securities.

3.5     Defendants expressly state that they do not consider security law compliance because they do not consider these promissory notes to be a security. Ferrum Capital and Sonoqui include this information within their terms and conditions and even mentions how beneficial it is for their company to not have to consider security compliance law within their commercial lending program terms and conditions:

"We do not consider any of the elements used in our program to be securities and therefore security law compliance does not need to be considered. For our program to not be subject to the Securities Act of 1933 or the Exchange Act of 1934 is attractive to us in order to avoid the expense of securities law compliance."

3.6     Regardless of this statement in the same document in the numerous amount of waivers and warnings listed, no doubt in an effort to overwhelm the lender, Defendant states the following in all italics, showing that even though they did not consider security law compliance it was a distinct possibility that the SEC may investigate them and find their program to be the sale of securities:

*"The SEC may investigate our program to determine if it involves the offering and sales of securities".*

*"We may be deemed to be selling securities as defined by the Securities Act of 1933"*

3.7     Brooklyn Chandler Willy is the founder of Texas Financial Advisory and Queen B Advisors, and operated the business in their principal place of business in Texas. Brooklyn Chandler Willy, Texas Financial Advisory, and Queen B Advisors are not, and were not at the time they exchanged these promissory notes registered to trade in securities. In 2020 Brooklyn Willy was involved in an action with the Texas State Securities Board in which they found that

the Promissory notes were securities, and Willy, by recommending clients to Ferrum was acting as a broker and receiving uncustomarily large commissions in return. Because of the referrals and suggesting to her clients to invest a disproportionate sum of their net worth into the Ferrum and Collins scheme Willy was ordered to repay 2.7 million in commission back to her clients.

**C. The Defendants Used Sales Tactics, and Deceitful Verbiage and Projections to Fraudulent Induce Plaintiffs and Class Members to Invest in Collins Asset Group, and other Defendants Through Unregistered Securities.**

3.8     Ferrum Capital marketed their process of trading in unregistered securities under the guise of a financial mechanism previously undiscovered that insulates their lenders from the dangers associated with the ebb and flow of the stock market:

"As one of the first companies in this newly emerging industry, we believe our business model presents an enormous opportunity to create a more transparent form of commercial lending. The key drivers of the lending model are the possibility of lower rates and better terms for borrowers compared to traditional sources of credit, and a new asset class for lenders with the possibility of attractive risk-adjusted returns that are not directly correlated to the performance of the stock market."

3.9     Ferrum Capital led the potential lender further astray by using phrasing such as "maximize potential returns while mitigating risks":

"Dependent Agreements that correspond to this Loan potentially offer Lenders protection from volatility in the stock and bond markets by focusing on an uncorrelated segment, that of high yield commercial lending, a segment that aims to maximize potential returns while mitigating risks."

3.10    Models that are identical to models that were offered by Sonoqui LLC, that displays ten percent (10%) return on investment and communications that reaffirmed the lies that were consistently fed to any prospective lenders, some of these models are displayed below:

THE LOAN INFORMATION

**INTEREST RATES:**

"FIXED"
**10.00%**
Annualized

"INCOME"
**8.00%**
Annualized

**MATURITY TERM OPTIONS:**

Four (4) Years

**INTEREST PAID OPTIONS:**

**FIXED** – At Maturity Term
**INCOME** – Quarterly in Advance after the First Year

Gay Schaffer
Ferrum/Goldstar IRA

Goldstar acct #                               182824074
4 yr 10% Fixed
Effective date (Promissory Note)              11/1/2019
$544,404.61

1st year anniversary                          11/15/2020

| Annual Rate | Annual Income | TFA commission paid directly by Ferrum | |
|---|---|---|---|
| 10% | 54,440.46 | $10,888.09 | 11/15/2020 |
|  | 54,440.46 | $10,888.09 | 11/15/2021 |
|  | 54,440.46 | $10,888.09 | 11/15/2022 |
|  | 54,440.46 | $10,888.09 | 11/15/2023 |

| Total Interest | 217,761.84 |
|---|---|
| Total Interest + Principal | $762,166.45 |
| Total Commission | $43,552.37 |

### D. Gay and David Shaffer's Personal Experience

3.11    The Plaintiffs first were intrigued by Brooklyn Chandler Willy and her services after hearing her discuss investment opportunities over the radio. On September 13th of 2019, the Plaintiffs met with Willy, an affiliate running Texas Financial Advisory who would recommend lenders to Ferrum and then Collins in return for the sizable commission of eight percent.

3.12    On September 19th, five days later the Plaintiffs met with Willy again. In this meeting Willy explained to the Shaffers that their investment was entirely protected, despite what the packet provided by Ferrum stated about risks. Willy even went as far as to say that she personally drove to Walt Collins house and vetted him out personally to ascertain his character and reliability, and then further reassured the Shaffers that their investment was a guarantee.

3.13    Willy continued by informing the Plaintiffs that even if Ferrum were to dissolve, the lenders would be protected because Ferrum owned a large amount of construction equipment that

would be liquidated in order to pay the Plaintiffs their money back. All of this culminated in the Schaffers joining the scheme.

3.14	At the end of January 2021, David Shaffer received a packet of paperwork in order to shift the control of his fidelity account from Brooklyn Chandler Willy to Yvette Barrera. Deep within the packet was a one paragraph disclosure of Willy's suspension. The Shaffers called Willy who said that it was a misunderstanding, and that she agreed to the consent order because it was not worth her time fighting it when she could be "helping" clients.

3.15	The Plaintiffs did not learn of Willy's incentive to refer them to a scheme that in effect shuffles one clients money to previous clients until they were gathering documents for the possibility of litigation. They then discovered an unsigned fee disclosure statement that displayed an eight percent commission received by the affiliate who referred the lender to Ferrum, in this case Willy referencing the Shaffers.

3.16	This ordeal has left the Shaffers, and all other class members who have become appraised of the scheme after joining, in fear that if they acted against Ferrum, Collins, and others that their life savings would quickly evaporate. Further all Plaintiffs in this position worry that the money that flows from future lenders will not be enough to satiate both their investment and the profit hungry conspirators, leaving them out in the cold like the class members in *Thaxton*.

## IV.    Class Action Allegations

4.1	Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class described as follows:

### A.  Nationwide Class

All persons and/or entities who are citizens of the United States that invested with Defendants Collins Asset Group, LLC and received secured promissory notes in exchange for their investments issued by Defendants Ferrum Capital LLC., Texas Financial Advisory, Sonoqui LLC, or any other entity involved in the scheme.

4.2	Excluded from the Class are Plaintiffs' counsel and family members, Defendants' employees, officers, directors; Defendants' legal representatives, successors, and assigns; any entity in which Defendants have a controlling interest; any Judge to whom the litigation is assigned and all of members of the Judge's immediate family; and all persons who timely and validly request exclusion from the Class.

### B.  Numerosity of the Class

4.3	The Class is so numerous that individual joinder of class members is impracticable.The precise number of class members and their identities and addresses are unknown to Plaintiffs

even though multiple class members have already been identified at this time. The number, identity, and address of each class member, can be readily ascertained from Defendants' records. Class members may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

### C.  Predominance of Common Question of Fact or Law

4.4     There are commonalities for all class members that must be answered. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

i. Whether the promissory notes that were sold to all members of the Class provided them a security interest in the assets of Defendant Collins Asset Group, LLC.

ii. Whether Defendants made uniform material misrepresentations and omissions in pre-sale marketing materials to members of the Class.

iii. Whether Defendants made uniform material misrepresentations and omissions in promissory notes presented to members of the Class.

iv.  Whether Defendants provided false investment valuations on account statements to all members of the Class.

v. Whether Defendants received substantial sums of undisclosed fees or other compensation from Plaintiffs' and Class Members' money.

vi. Whether Defendants commingled the funds of all members of the Class with funds from other business ventures.

vii. Whether Defendants used a uniform layered structure to funnel all Class Members' funds from the fundraising entities (e.g., Ferrum Capital) to Defendant Collins Asset Group, LLC and themselves.

viii. Whether Defendants provided all members of the Class with uniform marketing materials that concealed the use of investor funds for referral fees, commissions and payments to Defendants.

ix. Whether Defendants used uniform marketing materials containing false and misleading representations to describe the purported investment opportunity to all members of the Class in lieu of standard private placement memoranda.

      x. Whether the money of all members of the Class was pooled with other investors.

      xi. Whether all members of the Class did not share ownership in an LLC or private membership association.

      xii. Whether Defendants actively concealed the fraudulent nature of the investments from all members of Plaintiffs and Class Members.

      xiii. Whether Defendants actively concealed the fraudulent nature of the investments from all member of the Class by sending them emails and other correspondence providing false assurances that their money was safe and that they should not be concerned.

      xiv. Whether Defendants established a fiduciary or confidential relationship with Plaintiffs and Class Members.

      xv. Whether Defendants established a fiduciary or confidential relationship with Plaintiffs and Class Members.

      xvi. Whether Plaintiffs and Class Members are entitled to injunctive relief.

### D. Typicality of Claims

4.5     The Shaffers claims are typical of the Class. Plaintiffs, like other class members, were fraudulently induced to invest in unregistered securities that were unlawfully sold to them by Defendants as a result of misrepresentations and omissions made by Defendants in pre-sale marketing materials. Plaintiffs' and other class members' claims therefore arise from a common course of conduct by Defendants and are based on the same legal theories.

### E. Adequacy of Representation

4.6     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interest of the Class, and they have retained counsel competent in class action litigation. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

### F. Superiority of Class Action Claim When Compared to Other Means

4.7     A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by the class members combined are almost certain to exceed millions of dollars. While the damages suffered by each individual class member are

significant, they are small in comparison to the burden and expense of individual prosecution on the parties and the legal system. Without the class action device, it would be virtually impossible for class members individually to obtain effective redress for the wrongs done to them. The class action device presents fewer management difficulties, requiring only a single adjudication of the complex legal and factual issues in this dispute, providing the benefits of the large scale, and comprehensive supervision by a single court.

4.8     Plaintiffs and their counsel know of no difficulties which will be encountered in the management of this case which would preclude it being maintained as a class action.

## V.     Causes of Action

### A.  Breach of the Covenant of Good Faith and Fair Dealing

5.1     Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.2     A covenant of good faith and fair dealing is included implicitly in every contract.

5.3     When a contract grants onto one party discretion, the duty of good faith and fair dealing applies, and the party exercising the discretion must act in a manner that satisfies the objectively reasonable expectations of the other party. A party may not perform an agreement in a manner that would frustrate the basic purpose of the agreement or deprive the other party of its rights and benefits under the agreement.

5.4     Defendants have acted in a manner that frustrates the basic purpose of their contracts with Plaintiffs and/or Class Members by subjecting them to a bargain that they did not enter by placing them into a larger investment scheme, as alleged herein, without their knowledge or consent.

5.5     As a result of Defendants' misconduct, Plaintiffs and Class Members have been damaged in an amount that will be determined at trial.

### B.  Fraudulent Misrepresentation

5.6     Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.7     Defendants, acting in concert with one another, made material representations and/or material omissions to Plaintiffs and Class Members in connection with the sale of the promissory notes sold to them.

5.8     Defendants knew their misrepresentations and omissions made to Plaintiffs and Class Members were false and/or they were reckless with regards to the truth of the statement they offered.

5.9     Plaintiffs were unaware of these misrepresentations when they decided to invest in these promissory notes.

5.10    If the Plaintiffs were made aware of these misrepresentations when they decided to invest in the promissory notes, they would have not joined in the elaborate scheme orchestrated by Defendants.

5.11    As a result of Defendants' misconduct, Plaintiffs and Class Members have been damaged in an amount that will be determined at trial.

### C.  Fraudulent Concealment

5.12    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.13    Defendants affirmatively concealed material facts to Plaintiffs and Class Members.

5.14    The Defendants were under a duty to disclose all of the material facts that were in connection with selling investments in promissory notes to Plaintiffs and other Class Members.

5.15    The fraudulent concealment of material facts led to an omission that was justifiably relied on by Plaintiffs and other Class Members.

5.16    If the Plaintiffs and other class members would have been apprised of the facts that were fraudulently concealed they would not have invested in the scheme.

5.17    As a result of Defendants' misconduct, Plaintiffs and Class Members have been damaged in an amount that will be determined at trial.

### D.  Conspiracy to Defraud

5.18    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.19    Defendants had an agreement between each other to do an unlawful act or to do a lawful act through unlawful means, which resulted in fraud upon Plaintiffs and Class Members.

5.20    Defendants performed overt acts to accomplish this conspiracy separately, and while working in tandem with one another in order in pursuit of the conspiracy.

5.21    Plaintiffs suffered damages as a result of the acts done under the conspiracy.

### E.  Aiding and Abetting Fraud

5.22    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.23    Each Defendant knew that the other Defendants were defrauding Plaintiffs.

5.24     Each Defendant provided substantial assistance to the Defendants who were actively defrauding Plaintiffs and Class Members to advance the commission of the fraud.

5.25    These action directly resulted in damages alleged throughout this complaint to Plaintiffs and other Class Members.

### F.  Breach of Fiduciary Duty

5.26    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.27    Defendants owed Plaintiffs a fiduciary duty.

5.28    Defendants breached that fiduciary duty.

5.29    Defendants breach of fiduciary duty was the proximate cause of Plaintiff's damages.

5.30    Defendants beach of fiduciary duty was the actual cause of Plaintiff's damages.

### G.  Conspiracy to Commit a Breach of Fiduciary Duty

5.31    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.32    Defendants had an agreement between each other to do an unlawful act or to do a lawful act through unlawful means, which resulted in a breach of their fiduciary duty  owed to Plaintiffs and Class Members.

5.33    Defendants performed overt acts to accomplish this conspiracy separately, and while working in tandem with one another in order in pursuit of the conspiracy.

5.34    Plaintiffs suffered damages as a result of the acts done under the conspiracy.

### H.  Aiding and Abetting a Breach of Fiduciary Duty

5.35    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.36    Each Defendant knew that the other Defendants were breaching a fiduciary duty owed to the Plaintiffs and other class members.

5.37    Each Defendant provided substantial assistance to the Defendants who were actively breaching their fiduciary duty owed to the Plaintiffs and Class Members to advance the breach of said fiduciary duty.

5.38    These action directly resulted in damages alleged throughout this complaint to Plaintiffs and other Class Members.

### I. Constructive Fraud

5.39    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.40    Defendants acted or failed to act contrary to a legal or equitable duty, trust or confidence justly reposed, which was contrary to good conscience.

5.41    This action or inaction by the Defendants operated to the injury of Plaintiffs and Class Members.

### J. Injunctive Relief

5.42    Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.43    This Court has broad authority to restrain acts, such as here, that are tortious.

5.44    Plaintiffs and Class Members remain at imminent risk that further damages will occur in the future.

5.45    This Court should enter a judgment enjoining Defendants from encumbering and/or impairing the rights of Plaintiffs and Class Members in the security and/or collateral referenced in the promissory notes sold to them.

5.46    This Court should also enter a judgment enjoining Defendants from continuing to engage in the unlawful conduct described herein.

5.47    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy.

5.48    The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

5.49.   Issuance of the requested injunction will not disserve the public interest. An injunction would benefit the public by preventing the misconduct alleged above to continue.

## K.  Fraudulent Inducement

5.50   Plaintiffs restate and reallege paragraphs 1.1 through 3.16 as if fully set forth herein.

5.51   Defendants, acting in concert with one another, made material representations and/or material omissions to Plaintiffs and Class Members in connection with the sale of the promissory notes sold to them.

5.52   Defendants knew their misrepresentations and omissions made to Plaintiffs and Class Members were false and/or they were reckless with regards to the truth of the statement they offered.

5.53   Defendants made these fraudulent misrepresentations to induce the Plaintiffs and other Class Members to enter a contract they would not have entered into but for the inducement.

## VI.  Prayer for Relief

6.1   WHEREFORE,  Plaintiffs and Class Members respectfully request that the court grant Plaintiffs and all Class Members the following relief against the Defendants:

A. An order certifying the proposed plaintiff class herein and appointing Plaintiffs and their counsel of record to represent the Class;

B. An order that Defendants be permanently enjoined from its improper activities and practices described herein;

C. Restitution of all moneys, fees and interest paid by Plaintiffs and Class Members because of Defendants' unfair, unlawful or fraudulent business practices complained of herein;

D. Disgorgement by Defendants of all profits and compensation emanating from the unfair, unlawful or fraudulent business practices complained of herein;

E. An award of any additional damages, consequential and incidental damages and costs suffered by Plaintiffs and Class Members of the class because of Defendants' wrongful conduct;

F. Rescission of all contracts entered into between Defendants and Class Members that have fallen victim to the scheme described herein;

G. Prejudgment interest;

H. Attorney's fees, costs of suit, including expert witness fees;

I. Any such other and further legal and equitable relief as his Court may deem proper.

Respectfully submitted,

By: /s/ Matthew J. King
MATTHEW J. KING
State Bar No. 24097938
**KING ESTATE LAW, PLLC**
P.O. Box 575, Helotes, TX 78023
Office: (210) 319-8746
Direct: (512) 638-2720
Fax: (210) 783-1253
Email: info@kingestatelaw.com
Direct Email: matthew@kingestatelaw.com